UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

DANE MOREAU                                CIVIL ACTION NO. 6:21-cv-00419

VERSUS                                        JUDGE SUMMERHAYS

COMMISSIONER OF THE SOCIAL            MAGISTRATE JUDGE HANNA
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, and for the reasons set forth below, it is recommended that the Commissioner's decision should be reversed and remanded for further administrative action.

## Administrative Proceedings

The claimant, Dane Moreau, fully exhausted his administrative remedies before initiating this lawsuit. He filed applications for disability insurance benefits and supplemental security income benefits, alleging disability beginning on May 5, 2018.[1] His applications were denied.[2] He then requested a hearing, which was held on June 22, 2020 before Administrative Law Judge Devona Able.[3]    The ALJ

---

[1]    Rec. Doc. 9-1 at 241, 252, 259.

[2]    Rec. Doc. 9-1 at 95, 97.

[3]    A transcript of the hearing is found in the record at Rec. Doc. 9-1 at 54-94.

concluded that Mr. Moreau was not disabled within the meaning of the Social Security Act from the alleged disability onset date through the date of the decision.[4] Mr. Moreau asked the Appeals Council to review the ALJ's decision, but the Appeals Council found no basis for review.[5]  Therefore, the ALJ's decision became the Commissioner's final decision.[6]  Mr. Moreau now seeks judicial review.

## Summary of Pertinent Facts

The claimant was born on May 1, 1990,[7] and he was twenty-nine years old at the time of the ALJ's decision.  He graduated from high school and completed one year of college.[8]  He previously worked as a grocery store manager, landscaper, cable installer, billboard installer, and drywall installer.[9]  He alleged that he has been disabled since May 5, 2018 due to seizures, major depression, bipolar condition, anxiety, enlarged prostate, and attention deficit disorder.[10]

On August 2, 2016, Mr. Moreau was admitted to Vermilion Behavioral Health Systems on a physician's emergency certificate initiated by his sister due to

---

[4]    Rec. Doc. 9-1 at 40.

[5]    Rec. Doc. 9-1 at 6.

[6]    *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005).

[7]    Rec. Doc. 9-1 at 54, 241, 252, 259.

[8]    Rec. Doc. 9-1 at 63.

[9]    Rec. Doc. 9-1 at 63-68, 280, 302.

[10]    Rec. Doc. 9-1 at 100.

paranoia, psychosis, and aggressive behavior.[11]  History and physical examination showed that he was suicidal, underweight, had poison ivy, and abused amphetamines and opiates.  He was discharged on August 16, 2016 and was to follow up with outpatient therapy.  His discharge medications were Catapres, Lioresal, Vistaril, Paxil, and Suboxone.  The discharge diagnoses were major depressive disorder, recurrent and moderate, without psychotic features, and opiate use disorder, on maintenance treatment.

Mr. Moreau was again hospitalized at Vermilion Behavioral Health Systems on August 29, 2016 and discharged on September 8, 2016.[12]  He explained that, since the prior hospitalization, he had experienced stress, anxiety, and depression and was having suicidal thoughts.  History and physical examination showed that Mr. Moreau was dependent on opiates and nicotine, he abused methamphetamines, he had an enlarged prostate, and he had back pain.  Upon discharge, he was prescribed Clonidine, Lioresal, Vistaril, Cymbalta, Flomax, Inderal, and Tranxene.  The discharge diagnoses were major depression, recurrent, severe, without psychosis, opiate use disorder, amphetamine use disorder, enlarged prostate, and back pain.

---

[11]    Rec. Doc. 9-1 at 387-389.

[12]    Rec. Doc. 9-1 at 390-392.

Mr. Moreau went to the emergency department of University Hospital and Clinics on October 13, 2016 for psychiatric problems.[13]  He was anxious and unable to appropriately answer questions.  He was given Ativan, Zyprexa, and IV fluids and admitted for observation.  A CT scan of his head showed no acute intracranial abnormalities.  Several hours later, he awoke and became alert and oriented.  He reported possibly having taken too much medication accidentally.  He denied suicidal and homicidal ideation as well as auditory and visual hallucinations.  He was discharged the next day with a diagnosis of accidental drug overdose.

On November 23, 2016, Mr. Moreau was admitted to St. James Behavioral Health Hospital on a physician's emergency certificate after an intentional overdose of Baclofen in an attempt to get high but not kill himself.[14]  He had recently completed a course of treatment at the Woodlake Rehab Treatment Center[15] and stated that he had not used drugs in the past three months.  He admitted past use of methamphetamines, Ecstasy, and Oxycodone.  Upon admission, he was diagnosed with major depressive disorder, recurrent; polysubstance abuse; hypertension; and drug use.  His GAF score was 25.[16]  On November 25, 2016, he admitted having had

---

[13]     Rec. Doc. 9-1 at 403-407, 413-417, 464, 473-474.

[14]     Rec. Doc. 9-1 at 606-613.

[15]     The record contains no documentation of this treatment.

[16]     The Global Assessment of Functioning ("GAF") scale is used to rate an individual's "overall psychological functioning." American Psychiatric Institute, Diagnostic and Statistical

auditory hallucinations for the previous three days but denied suicidal or homicidal ideation. His medications were adjusted over the course of his hospitalization, and his discharge medications were Flomax, Thera-M, Wellbutrin, Mobic, Inderal, Tramadol, Trileptal, BuSpar, Seroquel, and Clonidine. The discharge diagnoses were major depressive disorder, recurrent; polysubstance abuse; hypertension; and drug use. He was assigned a GAF score of 50.[17] He was discharged on December 4, 2016 and was to seek follow up care at Woodlake Life Center.[18]

On May 17, 2017, Mr. Moreau saw Cynthia Preis, APRN, complaining about attention deficit disorder symptoms.[19] He stated that he had problems with concentration, short term memory, and impulsivity. He complained of anxiety and memory and thinking disturbances, but he denied depression, alcohol abuse, drug abuse, hallucinations, mania, psychosis, and suicidality. He was oriented, his mood

---

Manual of Mental Disorders ("DSM–IV") 32 (4th ed. 1994). The scale ascribes a numeric range from "1" ("persistent danger of severely hurting self or others") to "100" ("superior functioning") as a way of categorizing a patient's emotional status. A GAF score in the 21 to 30 range indicates "serious impairment in communication or judgment" or an "inability to function in almost all areas." The GAF scale was omitted from DSM–5 because of its "conceptual lack of clarity. . . and questionable psychometrics in routine practice." American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders ("DSM–5") 16 (5th ed. 2013).

[17]    A GAF score in the 41 to 50 range indicates "serious symptoms" such as suicidal ideation and any serious impairment in social, occupational, or school functioning such as the inability to keep a job.

[18]    The record contains no evidence of outpatient treatment at Woodlake.

[19]    Rec. Doc. 9-1 at 478-480.

and affect were normal, his speech was normal, his judgment and insight were intact. He was diagnosed with bipolar disorder, unspecified; generalized anxiety disorder; and attention deficit hyperactivity disorder, unspecified type. Mr. Moreau was to continue taking Geodon, Trileptal, Remeron, and Buspar, and Strattera was added to his medication regimen. He was to return in four months.

Mr. Moreau saw Ms. Preis again on October 10, 2017 for a "psych follow up."[20] He had been unable to fill the Strattera prescription, but he was taking the other prescribed medications. He described his mood as stable and stated that "everything seems to be all right." He complained about distractibility, an inability to concentrate, and inattentiveness. He denied having trouble sleeping; denied feeling sad, empty, or hopeless; and denied alcohol and drug use. He was oriented, his judgment and insight were good, his speech and thought were within normal limits, and his mood and affect were normal. The diagnoses were generalized anxiety disorder; attention deficit hyperactivity disorder, unspecified type; bipolar disorder, current episode depressed, mild or moderate severity, unspecified; other stimulant use, unspecified, uncomplicated; and opioid dependence, uncomplicated. The plan was to get Strattera approved by his insurer and to continue with Geodon, Trileptal, Remeron, and Buspar. He was to return in six months.

---

[20] Rec. Doc. 9-1 at 481-483.

Mr. Moreau was admitted to Vermilion Behavioral Health on November 28, 2017 for voluntary detox of heroin.[21]  He reported a long history of depression and anxiety with bipolar symptoms, he reported having a seizure disorder, and he admitted using heroin, Adderall off the streets, and meth.  His appearance was disheveled, his speech and language were slow, his attitude and behavior were guarded and irritable.  He was depressed and anxious with a flat affect.  His thought content was obsessive.  His perception, concentration, and attention span were within normal limits.  His insight and judgment were poor.  The admitting diagnoses were bipolar affective disorder, mixed, currently depressed without psychosis; tobacco use disorder; heroin use disorder, severe; methamphetamine use disorder, severe; seizure disorder by history; and noncompliance with medication and treatment.  He was placed on a variety of medications and engaged in group therapy. When discharged on December 4, 2017, he reported feeling better.  He was tolerating his medications, sleeping and eating well, and had no seizure activity.  He was to follow up with Ms. Preis for psychiatric medication management, and he was to see Rebecca Otter at AcadianaCares for mental health therapy.   His discharge medications were Keppra, BuSpar, Strattera, Trileptal, Remeron, Topamax, and

---

[21]     Rec. Doc. 9-1 at 393-396.

Depakote.   The discharge diagnoses were bipolar disorder, mixed, currently depressed without psychosis; heroin use; and amphetamine use.

When Mr. Moreau saw Ms. Preis on April 24, 2018, he reported being out of medication, stated that he was feeling more depressed even when taking his medication, and reported waking up three to four times each night.  He reported that his outlook was negative, hopeless, helpless, and drained.  He was working but finding it hard to get out of bed in the morning.  He complained of distractibility; excessive or inappropriate guilt; fatigue; energy loss; feeling sad, empty, and worthless; indecisiveness; markedly diminished interest in activities of daily living; unintentional weight loss; anxiety; depression; and disturbance of emotion.  He reported having last used stimulants and opioids in July 2017 and stated that he stopped smoking in December 2016.  His mood was depressed, and his affect was sad.   The diagnoses were bipolar disorder, current episode depressed, mild or moderate severity, unspecified; generalized anxiety disorder; and attention deficit hyperactivity disorder, unspecified type.  Paxil was prescribed, his Geodon and Strattera dosages were increased, Remeron was replaced with Trazodone, and he was to continue on Trileptal and Buspirone.  He was to return in two months.

On June 19, 2018, Mr. Moreau saw Ms. Preis again "for psych follow-up."[22] He reported a small improvement in his depression but no improvement in his anxiety. He had stopped working due to his depression and lack of an ability to concentrate. He described himself as "hopeless, miserable, disinterested" and "distant." He complained of fatigue and insomnia. His mood was depressed, and his affect was congruent and constricted. His medication was adjusted, and he was to make an appointment for individual psychotherapy. The diagnoses were bipolar disorder, current episode depressed, mild or moderate severity, unspecified, and generalized anxiety disorder.

Mr. Moreau lives with his sister and her family and his daughter visits every other weekend. In his August 26, 2018 function report,[23] he stated that his sister had to remind him to take his medications and to take care of his personal hygiene. He stated that his bipolar disorder, depression, and anxiety make it difficult for him to get along with people. He complained that his conditions have resulted in memory loss. He stated that he does not handle stress or changes in routine very well. He also stated that he wanted to isolate himself and stay away from other people.

---

[22]    Rec. Doc. 9-1 at 487-489.

[23]    Rec. Doc. 9-1 at 310-317.

9

On September 12, 2018, Mr. Moreau's sister, Mitzi Breaux, filled out a third-party function report.[24]  She stated that Mr. Moreau is "unable to handle normal demands of life or work.  For example, managing money, paying bills, daily stress of life."  Ms. Breaux stated that she assisted Mr. Moreau with his daughter's care every other weekend and with the care of Mr. Moreau's pets.  She stated that he had difficulty sleeping and sometimes slept all day.  She said that she gave him his medicine, provided his meals, and helped financially with his daughter's activities.  She stated that Mr. Moreau "is very overwhelmed by instructions – cannot listen effectively or doesn't have concentration to read them. . . can't focus to listen – gets overwhelmed, anxious & nervous."  In her opinion, his memory, concentration, and overall brain function are extremely affected by his conditions.  She stated that he has severe mood swings and that his conditions have damaged his relationships with all of his past friends and most of the family.  She also stated that his medications have side effects, leaving Mr. Moreau drowsy and "spaced out."

Mr. Moreau returned to Ms. Preis on October 22, 2018.[25]  He had run out of Strattera and, without it, his head felt foggy.  He also reported often feeling anxious.  He complained about difficulty maintaining sleep and an inability to think or concentrate.  He denied using illicit drugs.  He was alert, oriented, and cooperative.

---

[24]     Rec. Doc. 9-1 at 320-327.

[25]     Rec. Doc. 9-1 at 508-511.

His judgment and insight were intact.  He was well groomed with good eye contact. His speech was clear and normal.  His thought process was logical and goal directed. He denied suicidal and homicidal thought.  There was no evidence of psychosis.  His mood was depressed and anxious, but his affect was normal, and he displayed appropriate emotional responses.  His medications were again adjusted.  The diagnoses were bipolar disorder, current episode depressed, mild or moderate severity, unspecified, and generalized anxiety disorder.

On April 14, 2019, Nurse Preis filled out a medical source statement for Mr. Moreau.[26]  She noted that he had mild limitations in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances as well as mild limitations in the ability to sustain an ordinary routine without special supervision.  She noted that he had moderate impairment in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  In all other categories, she indicated that he had no impairment.  She indicated that Mr. Moreau was not capable of performing full time employment and noted that he was "not motivated."

---

[26]     Rec. Doc. 9-1 at 602-604.

An incomplete record from Mr. Moreau's appointment with Nurse Preis on May 21, 2019,[27] stated that he complained of anxiety, depression, difficulty sleeping, feeling sad and empty, an inability to concentrate, inattentiveness, and a markedly diminished interest in daily activities.  He denied drinking alcohol, smoking cigarettes, and using illicit drugs.  His medications were adjusted.

Mr. Moreau was admitted to Brentwood Hospital in Shreveport, Louisiana, on a physician's emergency certificate on June 7, 2019.[28]  He had overdosed on Tylenol in an attempt to take his life.  He also reported that he took several days of his daily medications with alcohol in order to "distract from reality."  Mr. Moreau reported tension with his ex-wife and strain with his brother-in-law.  He reported feeling guilty because his relationship with the mother of his child failed and he was not there for his daughter.  He had stopped taking Keppra for his seizure disorder because he rarely had seizures.  He reported suicidal ideation, depression, anxiety, feelings of hopelessness and helplessness, agitation, mood swings, guilt, decreased appetite, decreased sleep, decreased energy, and decreased concentration.  He denied homicidal ideation, auditory and visual hallucinations, and mind races.  Mr. Moreau reported that there were no stressors or triggers, just a feeling for the past three years that he no longer wanted to live.  He reported a decrease in concentration, sexual

---

[27]     Rec. Doc. 9-1 at 500-502.

[28]     Rec. Doc. 9-1 at 514-526.

interest, activity level, and overall interest in life.  He reported having been physically abused by his grandfather but denied flashbacks regarding the abuse.  He exhibited poor hygiene, his attitude was uncooperative, his speech was pressured, his affect was restricted, and his mood was depressed and irritable.  His insight and judgment were limited.  He was diagnosed with major depressive disorder, moderate, recurrent, without psychotic features, rule out bipolar disorder, and a history of seizures.  He was started on Effexor for depression, started on Abilify for depression and anxiety, Trileptal was discontinued, and Depakote was continued.  Mr. Moreau was discharged on June 14, 2019.

On June 17, 2019, Mr. Moreau was admitted to Calcasieu Oaks Behavioral Hospital under a physician's emergency certificate for increased agitation and altered mental state.[29]  He had not taken his medications for a week, stated that he had had depression and anxiety for years, and stated that his sister had "freaked out" and taken him to the hospital.  According to the PEC, he was noncompliant with medication, had poor insight, was anxious, depressed, agitated, had disorganized thoughts and flight of ideas.  During the assessment, he was anxious with poor insight but calm and cooperative.  He denied drinking alcohol and stated that he had not taken drugs for over a year.  He admitted physical abuse by his grandfather at

---

[29]     Rec. Doc. 9-1 at 528-566.

ages eight to nine as well as mental and verbal abused from an ex-girlfriend. He complained of insomnia and nightmares. He reported having a seizure two weeks earlier. The admitting diagnosis was bipolar disorder. On June 18, 2019, his GAF score was 20.[30] Mr. Moreau was discharged on July 1, 2019.

On July 26, 2019,[31] Mr. Moreau was seen at the Dr. Joseph H. Tyler, Jr. Behavioral Health Clinic for an initial screening upon referral from Calcasieu Oaks. He reported that his bipolar condition seemed to be evening out, but he was very depressed. He declined substance abuse treatment, stating that he was not using.

Mr. Moreau saw Dr. Glenn Ally at the Tyler clinic on August 14, 2021 for a new patient intake visit.[32] It was noted that he had a history of bipolar disorder and noncompliance with medications. He also had a history of substance abuse but had stopped using. His mother had died at an early age from liver damage due to heavy alcohol use, and he was sexually abused by his grandfather at age eight. His seizure disorder was controlled with medication. He was diagnosed with Bipolar I Disorder, unspecified, current or most recent episode depressed. His condition was described

---

[30]    A GAF score in the range of 11 to 20 generally indicates "some danger of hurting self or others."

[31]    Rec. Doc. 9-1 at 598-599.

[32]    Rec. Doc. 9-1 at 590-597.

as stable.  His medications were Mirtazapine, Lithium Sol, Buspirone, and Trileptal.  He was to return in one month.

Mr. Moreau saw Cyntrell Easton, a licensed professional counselor, at the Tyler clinic on August 27, 2019.[33]  He reported having a lot of anxiety and was observed shaking.  He denied suicidal and homicidal ideation and reported no substance abuse.  He was to continue seeing Dr. Ally for medication management.

On September 24, 2019, Mr. Moreau returned to see Ms. Easton and Dr. Ally.[34]  He reported that he had started a new job but was stressed and depressed due to the expectations of the job and his inability to remember how to complete simple tasks.  He was concerned about losing his job due to memory loss.  He felt that his Lithium medication was not working and was making him feel "fried," unable to recall, remember, or concentrate on his job.  Mr. Moreau and the counselor discussed how his past substance abuse may have caused issues with his current functioning.

Mr. Moreau saw Dr. Ally again on October 29, 2019.[35]  He complained that muscles in his arms and legs were jumping and reported that his leg gave out when using stairs.  Dr. Ally recommended that he see his primary care physician for those complaints.  He was to return in four months.

---

[33]     Rec. Doc. 9-1 at 582-589.

[34]     Rec. Doc. 9-1 at 574-581.

[35]     Rec. Doc. 9-1 at 568-573.

15

Mr. Moreau spoke with Dr. Ally on April 7, 2020 in accordance with COVID-19 protocols.[36]  Mr. Moreau complained of nausea associated with taking Lithium, and it was discontinued.  He was to continue taking his other medications and see Dr. Ally again in two to three months.

Mr. Moreau spoke with Dr. Ally again on April 30, 2020 because he was having unstable moods after going off the Lithium.  It was restarted in capsule form rather than in a liquid formulation.

On June 16, 2020, Mr. Moreau spoke with Dr. Ally again.  He complained that he became nauseated and felt bad after taking Lithium, so it was discontinued again.  He also complained about weight loss, and Dr. Ally recommended that Mr. Moreau see his primary care physician regarding nausea and weight loss.  Mr. Moreau stated that he could not work and was seeking disability benefits.  He was to return in one month.

On June 22, 2020, Mr. Moreau testified at a hearing regarding his symptoms and his medical treatment.  He stated that he lived with his sister, her husband, and her husband's daughter; his nine-year-old daughter stayed with them every other weekend.  Mr. Moreau stated that he struggled to get out of bed every day but was

---

[36]     Rec. Doc. 9-1 at 629-634.

receiving mental health treatment with Gary Allen[37] at the Tyler Mental Health Clinic.  He noted, however, that due to the pandemic, he was not able to see Mr. Allen in person but would contact him by telephone.  He stated that this was a problem because he had started having side effects from taking Lithium,  Mr. Allen told him to stop taking it, and he did so but needed a replacement medication because he was suicidal.  He testified that Mr. Allen then put him back on the Lithium, which had side effects resulting in nausea, vomiting, and a loss of twenty-five pounds.  He was unable to get a replacement for the Lithium over the phone.

Mr. Moreau stated that he has a seizure disorder but has only one to two seizures per year.  He stated that he stopped seeing Nurse Preis because she prescribed a medication that led to him having a seizure.

Mr. Moreau testified that his depression, bipolar condition, and anxiety play a major role in his life every day.  He stated that he stopped drinking alcohol and stopped taking street drugs, testifying that he formerly used street drugs to make his depression go away but realized that the drugs were destroying him.  He stated that he had been sober for over a year, since the prior May.  Still, however, he stated that "I struggle to do anything. . . .  I'm 30 years old and I'm struggling to do anything."  He said that he took care of his personal hygiene most days and tried to be more

---

[37]    This Court suspects this is a typographical or transcriptional error and Mr. Moreau was referring to Dr. Glenn Ally.

energetic when he had his nine-year-old daughter with him every other weekend. He denied having any hobbies, stated that it had been a long time since he had been in church, and testified that he was not helped by AA/NA meetings.  Mr. Moreau stated that he generally had about one week out of the month when he did not have suicidal thoughts throughout the day.  He said that he felt hopeless.

Mr. Moreau's father, Douglas Mark Moreau, also testified at the hearing.  He confirmed his son's struggling to just get out of bed.  He also stated that his son stayed extremely isolated and had recently begun locking his bedroom door, which was concerning.

Mr. Moreau's sister, Mitzi Breaux, testified as well.  She stated that Mr. Moreau's depression and anxiety completely consumed his life.  She also stated that she had learned that his bipolar condition was much worse than she had realized.

Mr. Moreau again spoke with Dr. Ally on July 21, 2020.[38]  He reported that his medications were not working and he was having mood swings.  Dr. Ally noted that Mr. Moreau had difficulty explaining what he was feeling except that his mood was not stable.  The plan was to wean him off Trileptal and replace it with Seroquel while continuing his other medications.

Mr. Moreau now seeks reversal of the Commissioner's adverse ruling.

---

[38]    Rec. Doc. 9-1 at 636-642.

18

## Analysis

**A.    Standard of Review**

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[39]  Substantial evidence is more than a scintilla but less than a preponderance.[40]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[41]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[42]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[43]  Conflicts in

---

[39]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[40]    *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[41]    *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[42]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[43]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

the evidence[44] and credibility assessments[45] are for the Commissioner to resolve, not the courts. Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[46]

## B.    <u>**Entitlement to Benefits**</u>

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[47] The Supplemental Security Income ("SSI") program provides income to individuals who meet certain income and resource requirements, have applied for benefits, and are disabled.[48]

A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

---

[44]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[45]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[46]    *Wren v. Sullivan*, 925 F.2d at 126.

[47]    See 42 U.S.C. § 423(a). See, also, *Smith v. Berryhill*, 139 S.Ct. 1765, 1772 (2019).

[48]    42 U.S.C. § 1382(a)(1) & (2). See, also, *Smith v. Berryhill*, 139 S.Ct. at 1772.

last for a continuous period of not less than twelve months."[49]  A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[50]

## C.    **Evaluation Process and Burden of Proof**

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled, which considers whether the claimant (1) is currently engaged in substantial gainful activity; (2) has a severe impairment; (3) has an impairment enumerated in the relevant regulations; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[51]

Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity[52] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in

---

[49]    42 U.S.C. § 1382c(a)(3)(A).

[50]    42 U.S.C. § 1382c(a)(3)(B).

[51]    20 C.F.R. § 404.1520; *Garcia v. Berryhill*, 880 F.3d 700, 704 (5th Cir. 2018).

[52]    20 C.F.R. § 404.1520(a)(4).

the record.[53]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[54]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[55]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[56]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[57]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[58]

---

[53]    20 C.F.R. § 404.1545(a)(1).

[54]    20 C.F.R. § 404.1520(e).

[55]    *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[56]    *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[57]    *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[58]    20 C.F.R. § 404.1520(a)(4); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

D.    <u>**The ALJ's Findings and Conclusions**</u>

In this case, the ALJ determined, at step one, that Mr. Moreau did not engage in substantial gainful activity after May 5, 2018, the claimant's alleged disability onset date.  This finding is supported by substantial evidence in the record.

At step two, the ALJ found that Mr. Moreau has the following severe impairments:  bipolar disorder, anxiety disorder, attention deficit hyperactivity disorder, substance abuse disorder, and seizure disorder.  This finding is supported by substantial evidence in the record.

At step three, the ALJ found that, including substance use, the severity of Mr. Moreau's impairments meets the criteria of Listing 12.04.  The ALJ further found, however, that if Mr. Moreau stopped the substance abuse, his remaining limitations would be severe but would not meet or medically equal the severity of a listed impairment.  Mr. Moreau challenged this finding.

The ALJ found that, if Mr. Moreau's substance use stopped, he would have the residual functional capacity to perform a full range of work at all exertional levels but could not work around hazards, such as unprotected heights and dangerous moving machinery; could not climb ladders, ropes, or scaffolds; would be limited to simple, routine, repetitive work and simple work-related decisions; and could have only occasional interaction with supervisors, coworkers, and the public.  Mr. Moreau challenged this finding.

23

At step four, the ALJ found that Mr. Moreau is not capable of performing his past relevant work.  Mr. Moreau did not challenge this finding.

At step five, the ALJ found that substance use disorder is a contributing factor material to the determination of disability because Mr. Moreau would not be disabled if he stopped the substance use.  The ALJ therefore found that Mr. Moreau was not disabled from the alleged disability onset date through September 9, 2020, the date of the ALJ's decision.  Mr. Moreau challenged this finding.

## E.    The Allegations of Error

Mr. Moreau contends that the ALJ erred (1) in failing to apply the six-step process set forth in SSR 13-2p regarding substance abuse disorder as a disqualification for disability; and (2) in failing to explain how he did not meet Listings 12.04 and 12.06 if he no longer had a substance abuse disorder.

## F.    Did the ALJ Err in Failing to Apply the SSR 13-2p Procedure?

The ALJ found that Mr. Moreau would meet the criteria for Listing 12.04 if his substance use was considered but further found that he would not meet the criteria of any listing if his substance use was not considered.  Social Security Ruling 13-2p[59] explains how cases involving drug addiction and alcoholism ("DAA") are to be evaluated.  When a claimant is found to be disabled considering all of his

---

[59]    SSR 13-2p – Titles II and XVI:  Evaluating Cases Involving Drug Addiction and Alcoholism, 78 FR 11939-01, 2013 WL 603764 (Feb. 20, 2013).

medically determinable impairments, a determination must then be made concerning whether the claimant would continue to be disabled if he stopped using drugs or alcohol; in other words, a determination must be made concerning whether DAA is material to the finding that the claimant is disabled.[60]  Ruling 13-2p sets forth a six-step procedure, which is to be used twice – once to show that the claimant is disabled and again to document materiality.  Mr. Moreau argued that the six steps were not followed by the ALJ in reaching his disability conclusions.

This Court finds, however, that the ALJ's error was more fundamental. Ruling 13-2p explains that substance use disorders are defined in the Diagnostic and Statistical Manual of Mental Disorders ("DSM") as maladaptive patterns of substance use that lead to clinically significant impairment or distress.  However, a "claimant's occasional maladaptive use or a history of occasional prior maladaptive use of alcohol or illegal drugs does not establish that the claimant has a medically determinable Substance Use Disorder."[61]  Further, "a claimant has DAA only if he or she has a medically determinable Substance Use Disorder."[62]  There must be "signs, symptoms, and laboratory findings – from an acceptable medical source that

---

[60]    SSR 13-2p.

[61]    SSR 13-2p.

[62]    SSR 13-2p.

supports a finding that a claimant has DAA."[63]  The ALJ should not make "a determination regarding materiality if a claimant has a history of DAA that is not relevant to the period under consideration."[64]

Mr. Moreau has a history of substance abuse, but aside from a suicide attempt when he mixed alcohol and medications, there is no evidence that he used or abused drugs or alcohol during the time period for which he claimed disability. Accordingly, the ALJ's analysis of Mr. Moreau's alleged disability through the DAA lens was not based on substantive evidence in the record.  Furthermore, by using the DAA protocol in this case, the ALJ relied on an erroneous legal standard, requiring that this matter be remanded.

**G.    Did the ALJ Err in Evaluating Whether the Claimant Would Meet Listings 12.04 and 12.06 Absent a Substance Abuse Disorder?**

Mr. Moreau alleged that he became disabled on May 5, 2018 primarily due to mental health impairments.  The documents in the record show that he was hospitalized three times in 2016 and once in 2017 for mental health problems. Thereafter, he obtained outpatient mental health treatment and was also hospitalized twice in 2019 for mental health treatment.  The ALJ found, however, that Mr. Moreau's mental health impairments did not meet the criteria of Listing 12.04, which

---

[63]    SSR 13-2p.

[64]    SSR 13-2p.

addresses depressive, bipolar, and related disorders, or Listing 12.06, which addresses anxiety and obsessive-compulsive disorders.

In reaching this conclusion, the ALJ relied on an evaluation by Dr. Ryan Jones, an agency examiner who did not meet Mr. Moreau at any time and did review the entire record. Dr. Jones's evaluation is dated October 31, 2018, which was before Mr. Moreau's two hospitalizations in 2019 and before he began treating with Dr. Ally at the Tyler Clinic. When Dr. Jones evaluated whether Mr. Moreau's impairments satisfied the criteria for Listings 12.04 (depressive, bipolar, and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders), he found that Mr. Moreau had moderate impairment in all four categories of functionality evaluated under Paragraph B of the listings, and he found that the evidence did not establish the presence of the criteria set forth in Paragraph C of the listings.[65]

The ALJ adopted Dr. Ryan's analysis of the Paragraph B criteria, apparently without considering the significance of the two hospitalizations in 2019. The ALJ concluded that because treatment notes following those hospitalizations indicated that Mr. Moreau was "alert" and "attentive" despite a "neutral mood" and "constricted affect," the record "did not reflect more significant problems" in his ability to function in the category of concentrating, persisting, or maintaining pace

---

[65]      Rec. Doc. 9-1 at 103-104.

or in the category of adapting or managing oneself.  This is a narrow view of the record evidence, ignoring the fact that Mr. Moreau was hospitalized for mental health treatment six times in a three-year time period, repeatedly reported problems with the medications he was prescribed for his mental health conditions, and continued to complain *inter alia* of depression, anxiety, memory loss, lack of concentration, and mood swings.  This Court finds that there is a lack of substantial evidence to support the ALJ's evaluation of the Paragraph B criteria.

The ALJ also found, just as Dr. Ryan had, that the evidence in the record failed to establish the existence of the Paragraph C criteria.[66]  A claimant is disabled under Paragraph C of Listings 12.04 and 12.06 if he has a serious and persistent mental disorder that has been documented to exist for at least two years and there is also evidence of both ongoing treatment and marginal adjustment.

The record shows that Mr. Moreau had ongoing treatment for major depressive disorder from 2016 forward and for bipolar disorder and generalized anxiety disorder from 2017 forward, thus documenting his receiving treatment for those conditions for more than two years.  When Dr. Jones evaluated Mr. Moreau, however, that was not the case since the earliest documents that Dr. Jones reviewed were dated 2016 and his evaluation was conducted in 2018.  Thus, Dr. Jones was

---

[66]    Rec. Doc. 9-1 at 36.

correct when he wrote his report that the Paragraph C criteria were not present.  But the ALJ erred in failing to find that they were present when he reached his decision two years later.

By 2020, when the ALJ's ruling was issued, the record clearly showed that Mr. Moreau had received mental health treatment for depression, anxiety, and a bipolar condition for more than two years.  Thus, the Paragraph C(1) criteria seems to be satisfied.  While there appears to be a post-hospitalization improvement in Mr. Moreau's condition, a six-month gap in treatment, and evidence of noncompliance with medication, Paragraph C(1) expressly addresses how such improvements, gaps, and noncompliance should be considered.  Therefore, there is evidence in the record relevant to the Paragraph C(1) criteria.

To satisfy the Paragraph C(2) criteria, a claimant must have only marginal adjustment, which occurs when the evidence shows that changes or increased demands have led to exacerbation of signs or symptoms and a deterioration in functioning.  Examples of marginal adjustment include hospitalizations and absences from work.  Mr. Moreau had two hospitalizations in 2019 and stated at the hearing that he had difficulty getting out of bed in the morning.  He had brief periods of employment in 2018 and 2019.  In April 2018, he was working but having trouble getting out of bed and had stopped working in June.  Therefore, there is evidence in the record relevant to the Paragraph C(2) criteria.

Consequently, the ALJ erred in failing to evaluate Mr. Moreau's mental health conditions under Paragraph C of Listings 12.04 and 12.06. This was a prejudicial error on the part of the ALJ that requires remand of this matter for further consideration. Additionally, there is a lack of substantial evidence supporting the ALJ's conclusion regarding the Paragraph B criteria of Listings 12.04 and 12.06. This error also mandates remand of this matter.

### Conclusion and Recommendation

For the reasons fully discussed above, this Court recommends that the Commissioner's decision should be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to evaluate whether Mr. Moreau's impairments meet or medically equal the severity of Listings 12.04 and 12.06 under both Paragraph B and Paragraph C of the listings. Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).[67]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of

---

[67]    See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[68]

Signed in Lafayette, Louisiana, this 15th day of December 2021.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[68]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).

31